# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In re:                                    )    Chapter 11
                                          )
ARLINGTON HOSPITALITY, INC.,              )    No. 05 B 34885
*et al.*,                                 )    (jointly administered)
                                          )
                          Debtors. )           Judge Goldgar

## MEMORANDUM OPINION

This is an unusual case of post-petition financing gone bad.  In 2005, Arlington

Hospitality, Inc. and its subsidiaries (collectively, "Arlington"), operators of the "AmeriHost"

hotel chain, filed for relief under chapter 11.  Before filing, Arlington hastily negotiated an

agreement for post-petition financing with Arlington LF, LLC ("LF"), an unrelated entity.  After

filing, Arlington moved for entry of interim and final orders authorizing the financing.  An

interim order was entered authorizing part of the financing, as the motion had requested.  No

final order authorizing the rest was ever entered, however, because within weeks LF refused to

go through with the transaction.  LF then declared Arlington in default under the agreement.

As planned, Arlington's business was ultimately auctioned and sold in the bankruptcy.

Out of the proceeds, Arlington repaid with interest the loan LF had made under the interim order.

But Arlington refused to pay LF default interest, nor was Arlington willing to pay any of the fees

under the agreement -- interest and fees totaling more than $620,000.  In Arlington's view, LF

breached the agreement in declining to proceed with the financing.  LF therefore had no right to

default interest or fees.

Faced with Arlington's refusal to pay, LF moved under 11 U.S.C. §§ 364(c)(1) and

503(b) for payment of these sums as administrative expenses pursuant to the interim order.

Arlington objected to the motion, as did the Official Committee of Unsecured Creditors ("the Committee"), and the matter went to trial. LF's motion is now before the court for ruling. For the reasons discussed below, the motion is denied.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), and (O). The court accordingly may enter a final judgment. *In re Smith*, 848 F.2d 813, 816 (7th Cir. 1988).

### 2. Facts

The trial on LF's motion produced a surprisingly large record: more than 700 pages of trial transcript, five deposition transcripts (roughly 900 pages) that the parties decided to stipulate wholesale into evidence, and nearly 120 exhibits.[1] The relevant facts, however, are fewer than the record's size suggests.

### a. Background

Arlington developed and operated limited service roadside hotels under the "AmeriHost" brand name. (Stip. at ¶ 3; Morgner dep. at 12). As of August 2005, Arlington owned or leased 36 of these hotels, mostly in the Midwest. (Stip. at ¶ 3; Tr. at 3/134). Because the hotels relied heavily for business on drive-by highway traffic, Arlington's business was seasonal. (Tr. at

---

[1]    The trial transcript is in three volumes and is cited in this opinion as "Tr. at [volume]/[page]." Deposition transcripts are cited by the name of the deponent: "_____ dep. at ___." The joint exhibits of Arlington and the Committee are cited as "Jt. Ex. ___." LF's exhibits are cited as "LF Ex. ___." The parties' stipulation of facts is cited as "Stip. at ¶ ___."

3/131-32; Morgner dep. at 12). Summer was the busy season, and business – along with cash flow – fell substantially when summer ended. (Tr. at 3/132; Morgner dep. at 12).

Particularly during its slow season, Arlington relied for operating capital on a revolving line of credit with LaSalle Bank ("LaSalle") secured by all the assets of the company. (Tr. at 2/217-18, 3/133). Over the years, however, that line of credit had steadily been reduced. (*Id.* at 3/143). By the summer of 2005, Arlington had no further liquidity on the LaSalle loan (*id.* at 2/213, 2/217; Morgner dep. at 28; Dale dep. at 80), the balance of which then stood at approximately $3.5 million (Morgner dep. at 14). In August 2005, Arlington was unable to make a scheduled "step down" payment to LaSalle that would have reduced the balance still further. (Tr. at 3/212-13; Dale dep. at 81).

In early 2005, Arlington had also run into trouble with PMC Commercial Trust, the lessor of 18 AmeriHost hotels. (Dale dep. at 11; Tr. at 2/193). PMC filed an action in Texas against Arlington Hospitality, Inc. and one of its subsidiaries (Tr. at 2/193-94) and in June 2005 obtained an *ex parte* order permitting the attachment of the subsidiary's assets (*id.* at 2/194-95). That order caused the subsidiary, Arlington Inns, to file a petition under chapter 11. (Stip. at ¶ 1). PMC then moved for summary judgment against the parent. (Tr. at 2/196). The motion was set for hearing on September 2, 2005. (*Id.*). If PMC's motion succeeded (and Arlington's general counsel suspected it would succeed), the resulting judgment would endanger the company's existence. (*Id.* at 2/197-200).

In July 2005, Arlington engaged Chanin Capital Partners, an investment banking firm, to help explore its financial options, including a chapter 11 filing. (Tr. at 2/204, 2/208; Morgner dep. at 9-11). Near the end of July, Chanin recommended a bankruptcy filing and sale of the company, a recommendation Arlington's board accepted. (Tr. at 2/213-14, 3/144). Chanin

began soliciting interest in Arlington from potential purchasers, as well as from potential lenders who might provide post-petition, debtor-in-possession ("DIP") financing. (Tr. at 2/216; Morgner dep. at 15-17).

One of the potential purchasers solicited was DH2, Inc. ("Diamond," for purposes of this litigation), a money manager, investment advisor, and occasional lender that had been involved with Arlington before. (Tr. at 1/8-10, 1/33). In early August, Chanin sent Diamond a draft asset purchase agreement. (Tr. at 2/223; Jt. Ex. 23). Chanin also sent Diamond a draft order for DIP financing (*id.*), although Diamond thought of itself primarily as a prospective purchaser of Arlington (Tr. at 1/32-33). About two weeks later, though, Diamond learned from Chanin that Arlington's board was set to approve another candidate, one who would serve both as "stalking horse" bidder and as DIP lender. (Tr. at 1/37).

The deal with the other candidate fell apart (Tr. at 1/40-41), and on August 26, Arlington and Diamond resumed discussions (*id.* at 1/45, 2/224-26). Over the next five days, the parties negotiated the terms of post-petition financing for Arlington. (*Id.* at 1/47-48, 1/69, 1/143-53; Jt. Exs. 26-27). Around 6:30 p.m. on August 31, Arlington and LF – a special purpose entity Diamond created to transact business with Arlington (Stip. at ¶ 4; Tr. at 1/8-9) – executed a document entitled "Outline of Terms and Conditions for Total DIP Financing Facility" (the "Term Sheet") (Tr. at 2/119-20, 3/153-54; Stip. at ¶ 5; *see* Jt. Ex. 1). Two hours later, and just 48 hours before the scheduled summary judgment hearing in the PMC litigation, Arlington and its remaining subsidiaries filed bankruptcy petitions. (Docket No. 1).

Diamond had no experience with bankruptcy. (Tr. at 1/21, 1/29; Rubin dep. at 49). It had never been involved in a bankruptcy and so had never made a loan to a debtor in a bankruptcy. (Tr. at 1/29, 1/142; Rubin dep. at 158 ("We had no experience whatever with DIP

-4-

lending")). Diamond's (and LF's) president, Robert Rubin, admitted: "[W]e didn't understand anything about bankruptcy at all." (Tr. at 1/21). Diamond was also uncomfortable with the speed at which the Term Sheet was negotiated, leaving what it felt was insufficient time for proper due diligence.[2] (Tr. at 1/64-68; Rubin dep. at 64-68; Marks dep. at 81 ("We went in on a leap of faith to some extent")). Diamond nevertheless proceeded with the financing, and LF executed the Term Sheet, because Diamond was interested in preserving its opportunity to purchase Arlington. (Rubin dep. at 163; Marks dep. at 25-26, 35; *see also* Morgner dep. at 120; Jt. Ex. 45).[3]

### b. The Term Sheet

The Term Sheet provided for a "Total DIP Facility" of $11 million, but the $11 million was broken down into three separate loans. (Jt. Ex. 1 at 3). The first was an "Interim DIP Facility" consisting of a revolving loan (the "Revolver") not to exceed a balance of $6 million. (*Id.*). According to the Term Sheet, the Revolver would close on the first date not later than September 7 when "the Bankruptcy Court shall have entered [an] Interim Order [authorizing the Revolver] in a form and substance satisfactory to the Lender." (*Id.* at 4). The other two loans were term loans, denominated "Term Loan A" and "Term Loan B." Term Loan A was a $1 million loan available only after December 31, 2005; Term Loan B was a $4 million loan intended to fund Arlington's purchase of "five executory contracts of unimproved real estate."

---

[2] Rubin's discomfort was such, he testified, that during "the whole month of August I was questioning the integrity of the process and the integrity of their [Arlington's] intentions with regards to us." (Rubin dep. at 68).

[3] Contrary trial testimony from Diamond's general counsel, Richard Marks (*see* Tr. at 2/43-44), was equivocal and unworthy of belief.

(*Id.* at 3). Closing of the term loans was conditioned on, among other things, execution of "complete loan documentation" and on the bankruptcy court's entry of a "Final Order in form and substance satisfactory to the Lender." (*Id.* at 4).

Under the Term Sheet, interest was payable on the Revolver at an annual rate equal to the three-month LIBOR rate plus 7.5%, and default interest of an additional 3%. (*Id.* at 5). Term Loans A and B had separate and slightly higher interest rates. (*Id.*).

The Term Sheet provided for payment to LF of various fees. Listed separately under the caption "Fees," these included a "Total DIP Facility Commitment Fee"[4] of $100,000 "payable immediately," a "Total DIP Facility Funding Fee" equal to 3% of $7 million – $210,000 – payable "on the entry date of the Interim Order," and an assortment of other fees and charges. (*Id.* at 6). LF was also entitled to reimbursement of its "reasonable legal fees" and "reasonable out-of-pocket expenses" incurred in connection with Arlington's bankruptcy. (*Id.* at 8).

All obligations of Arlington to LF – loan principal, interest, and fees – were to be treated in the bankruptcy as super-priority administrative expenses. (*Id.* at 4). Arlington's obligations would also be secured by a first priority security interest in all property of Arlington's bankruptcy estate (with exceptions not relevant here). (*Id.* at 4-5).

Interest and fees were not all that LF received under the Term Sheet. Arlington agreed to a ten-day period during which it would negotiate the terms of an asset purchase agreement, or enter into such an agreement, only with LF. (*Id.* at 8).

In a section captioned "Use of Proceeds," the Term Sheet specified what Arlington could do with the proceeds of the three loans. (*Id.* at 6). The proceeds were to be used to pay off the

---

[4]    Or as one court reporter mistranscribed it, irony presumably unintended: "total DIP futility commitment fee." (Morgner dep. at 115).

LaSalle loan, to "pay fees and expenses associated with this transaction," to provide Arlington

with working capital, and to finance the acquisition of certain undeveloped parcels of land. (*Id.*).

Events of default included Arlington's failure to make any of the payments due LF and failure to

cure the default in five days. (*Id.* at 7).

### c. The Motion and the Hearing

On September 1, 2005, Arlington filed the usual barrage of "first-day" motions that afflict

large chapter 11 cases. (Docket Nos. 8-19). One of these was a 21-page motion for interim and

final orders under 11 U.S.C. §§ 364(c) and (d) authorizing Arlington to obtain post-petition

financing. (Stip. at ¶ 7; *see* Jt. Ex. 3). Attached to the motion as an exhibit was an executed

copy of the Term Sheet. (Ex. 1 to Jt. Ex. 3). Also attached was a draft "Interim Order

Authorizing Incurrence of Indebtedness." (Jt. Ex. 3; *see* Jt. Ex. 6). Exhibit 1 to the draft Interim

Order was a spreadsheet that the Interim Order said was "the Budget." (Ex. 1 to Jt. Ex. 6).

Arlington's financing motion described the three loans, the interest, and the fees (Jt. Ex. 3

at 10-11), making clear that approval was sought on an interim basis only for the Revolver and

only for the amounts in the budget (*id.* at 11). The motion, however, suggested that all of the

fees payable to LF were associated with the Revolver, listing those fees with the Revolver in the

motion's description of "key economic terms" rather than with the two term loans. (*Id.* at 10).

The motion said that the terms of the proposed financing were those "set forth in the Term

Sheet" but also referred to the financing "to which the Debtors and the Lender have agreed in the

Term Sheet and in the form of the Interim Order" (*id.* at 10), both of which had been negotiated

"at arms-length and in 'good faith'" with the assistance of counsel (*id.* at 10-11).

Arlington presented its motion the next day. PMC and another creditor, Cendant

Corporation, objected to the motion.[5/] The crux of the objection was the size of the fees, which

Arlington's counsel described as amounting to $410,000, $310,000 of it payable "when we draw

on this line to pay off LaSalle." (Jt. Ex. 7 at 42-43). To this objection, Arlington's counsel

responded that Chanin had extensively marketed the opportunity to provide DIP financing to

Arlington with little success (*id.* at 43-44); that Arlington had spent "a considerable amount of

time" negotiating with LF over the fees (*id.* at 45); and that Arlington had asked LF that very day

to reduce the fees, to which the answer had been "no" (*id.*).

One of LF's outside counsel also spoke in favor of the motion. She noted that LF had

been approached just one week earlier, had assembled the DIP financing proposal in the space of

"four working days," and stood ready to put "$4 million at risk with virtually no diligence" and

with "what I would consider very minimal documentation." (*Id.* at 57-58). "There is no

question," she said, that "this is high risk, and I think the fees represent a reflection of that." (*Id.*

at 59).

With PMC and Cendant unable to demonstrate that better terms could obtained, the court

granted Arlington's motion. (*Id.* at 59). The Interim Order was entered that day. (Jt. Ex. 6;

Docket No. 42).

### d. The Interim Order

The Interim Order made a series of findings (one of them that LF had agreed to extend

DIP financing "on the terms and conditions contained herein"), and then stated that Arlington's

---

[5/]      In 2002, Arlington had sold the "AmeriHost" brand to Cendant Corporation and
entered into royalty sharing and development agreements with Cendant. (Tr. at 2/209-10).
Cendant was unhappy with the agreements, wanted out of them, and in 2004 had offered
Arlington a substantial sum to get out of them (*id.* at 3/86-87), an offer Arlington did not accept.

motion was "granted in all respects." (Jt. Ex. 6 at 3-4).

But the Interim Order did not stop there. It declared: "The Debtors shall be and hereby are authorized to borrow money and undertake financial obligations to Lender as described in the budget attached hereto as Exhibit 1 (the 'Budget') on the terms and conditions contained in this Order." (*Id.* at 4). Two paragraphs later, the Interim Order repeated that "[a]ll post-petition advances made by Lender to the Debtors shall be . . . made in accordance with the terms of this Order." (*Id.*). Indeed, the Debtors were not only authorized but "directed" to "perform all of their obligations to give effect to the terms of the financing provided by this Order." (*Id.*).

Paragraph 5 of the Interim Order stated that the "Post-Petition Advances made under the Revolver" would be "made under the following terms." The Interim Order then gave $6 million as the "Initial Loan Amount," followed by the regular and default interest rates and all of the fees mentioned in the Term Sheet, including "Commitment Fee: $100,000, payable immediately" and "Total DIP Facility Funding Fee: $210,00.00[,] payable immediately." (*Id.* at 4-5). In addition, the Interim Order provided that Arlington would pay LF's "reasonable attorney's fees and expenses" incurred in the bankruptcy. (*Id.* at 6). "All of the Lender's fees, costs and expenses" incurred in the bankruptcy, including the attorney's fees, were payable "upon invoice." (*Id.*)

Under the Interim Order, Arlington's "Post-Petition Obligations" to LF, meaning the loan principal, the interest, and the fees, were granted status as super-priority administrative expenses under 11 U.S.C. § 364(c)(1). (*Id.* at 1, 5). The obligations were also secured by first priority liens on the "DIP Collateral," meaning all property of the bankruptcy estates (again with exceptions not relevant here). (*Id.* at 1-2, 5).

The Interim Order also provided for "Events of Default." One of them was "[t]he failure of the Debtors to make any payment described in paragraph 5 of this Order." (*Id.* at 6). Upon an

Event of Default, LF was obligated to give Arlington three business days written notice of the default during which time the default could be cured. (*Id.* at 7). If the default remained uncured, LF could, among other things, "declare the Post-Petition Obligations [which included the various fees] to be immediately due and payable" and "exercise any and all rights and remedies allowed under applicable non-bankruptcy law." (*Id.*).

Like the Term Sheet, the Interim Order granted LF a ten-day period under which Arlington could only negotiate the terms of an asset purchase agreement, or enter into such an agreement, with LF. (*Id.* at 8).

Unlike the Term Sheet, however, the Interim Order had no general "Use of Proceeds" provision. (*See* Jt. Ex. 1 at 4). The Interim Order specifically authorized Arlington to repay the LaSalle loan. (Jt. Ex. 6 at 8). Otherwise, the Interim Order provided that Arlington could "borrow money . . . as described in the budget attached hereto as Exhibit 1." (Jt. Ex. 6 at 4). The budget, in turn, said that during the week of September 2, 2005, Arlington would borrow the $3,530,000 necessary to pay off the LaSalle loan. (Ex. 1 to Jt. Ex. 6). But whereas the Term Sheet had said the financing could be used to "pay fees and expenses associated with this transaction" (Jt. Ex. 1 at 4), under the budget attached to the Interim Order "DIP Fees" were to be paid, not from a draw on the Revolver, but with separate funds, funds Arlington had to come up with itself (Ex. 1 to Jt. Ex. 6; *see also* Tr. at 3/20-21, 3/100, 3/210-11).

Missing from the Interim Order was any mention of the Term Sheet. The Term Sheet was neither attached to the Interim Order nor incorporated into the Interim Order by reference.

### e. Repudiation of the Agreement

On September 7, 2005, Arlington drew on the Revolver. (Tr. at 1/78, 2/20). LF wired

$3,530,000 to LaSalle Bank, paying off Arlington's pre-petition loan from LaSalle in full. (Stip.

at ¶ 14; Tr. at 1/88, 2/174). Arlington, however, did not pay the various loan fees. (Tr. at 2/67-

68, 2/114-15). It was Arlington's belief that those fees had been paid through a draw on the

Revolver. (*See* Jt. Ex. 8).

The ten-day period for Arlington to negotiate an asset purchase agreement exclusively

with LF ended on September 16. (Tr. at 2/64). Although the parties met several times to

hammer out an agreement (*id.* at 2/22-23, 2/237, 3/247-48), LF developed concerns about the

company, particularly whether the Cendant agreements were transferable (*id.* at 2/37-53, 2/59-63;

Jt. Ex. 45). On September 14, Richard Marks, Diamond's general counsel, had a telephone

conversation with Arlington's president, Steve Miller, in which Marks appeared to Miller to be

"[u]nsure, [n]ervous, fishing for certainty." (Jt. Ex. 45). "[C]onfidence," Miller wrote in a

message to Chanin's Richard Morgner, "may be waning." (*Id.*; Tr. at 2/41-42). By September

16, Marks testified, LF "recognized this [acquisition] was not something we were going to

ultimately do." (Tr. at 2/64).

LF started to have misgivings about its position as Arlington's post-petition lender, as

well. (Tr. at 2/66). Partly because of the questions surrounding the Cendant agreements, and

partly because of questions about certain Arlington joint ventures, LF began to doubt the value of

the collateral supporting the loans. (*Id.* at 2/39-40, 2/56-60, 2/66, 3/40-41; Marks dep. at 81;

Morgner dep. at 140). LF's discomfort on this score became so great that before a September 21

hearing Marks told Morgner he wanted to express to the court LF's deep concerns about the

company's value.[6] (*Id.* at 2/243). LF also demanded extensive financial reporting from

---

[6]      He was talked out of this unorthodox maneuver. (Tr. at 2/244, 3/62-63).

-11-

Arlington, and in LF's view Arlington was not meeting its demands. (LF Ex. Y; Tr. at 2/24-26, 2/80-81). Arlington failed to produce the reports LF thought it should be receiving, and those Arlington did supply LF found inaccurate and unreliable. (LF Ex. Y; Tr. at 2/92-93, 2/170-73).

On September 29, matters came to a head. Marks told Morgner during a telephone call that LF was unwilling to "fund any more money under the DIP." (Tr. at 2/247, 3/190-91, 3/237-38). Following the call, Morgner sent an e-mail to Miller and two other Arlington officers recounting his "long conversation" that afternoon "with Richard Marks regarding the status of Diamond as both a potential bidder and DIP lender." (Jt. Ex. 54). Morgner advised Miller and the others that "the issues with Cendant have damaged Diamond's view of the value of the Estate's collateral to the point where they do not wish to fund any more $ under the DIP." (*Id.*).

On October 4, less than a week later, counsel for the Committee sent an e-mail to another of LF's outside counsel asking to "verify your client's position." (Jt. Ex. 11). As Committee counsel understood it, "LF did not intend to proceed on the DIP due to various concerns, including lack of collateral coverage. Is that correct?" (*Id.*). Counsel for LF answered: "We are not willing to proceed further with the DIP loan; in other words, we will make no further loans to the Debtors. The lien granted to us by the interim orders [*sic*] secures the existing indebtedness. We think the Debtor should find a new DIP lender to pay out our loan and fund the options that expire at the end of this month." (*Id.*).

Meanwhile, LF had sent no invoices to Arlington following the Interim Order's entry on September 2. (Tr. at 2/132, 3/192). On September 27, Arlington's chief financial officer, James Dale, e-mailed Ben Shibe, an analyst at LF, and asked for a statement confirming the balance of the loan. (Jt. Ex. 8; Tr. at 3/192). On October 6, two days after the e-mail from LF's outside counsel declaring an unwillingness to "proceed further with the DIP loan," Shibe sent Dale a

statement reflecting the LaSalle payoff and also showing $456,216.67 due in fees. (Jt. Ex. 12). The accompanying e-mail asked that Arlington "[p]lease submit payment."[2]  (Id.).

Arlington did not pay the October 6 invoice. (See Jt. Ex. 62). On October 20, 2006, LF's outside counsel faxed Arlington's counsel a letter noting that the October 6 statement had been sent and not paid, and declaring a default of the Post-Petition Obligations under the Interim Order. (Jt. Ex. 13; Tr. at 2/94, 3/107-08).

### f. Withdrawal of the Motion

October 25, 2005, was the continued date for the court to consider entry of a final order authorizing post-petition financing. Following the entry of the Interim Order, the Committee had been appointed. (Docket No. 57). The Committee promptly filed not one but two objections to the entry of a final order. (Docket Nos. 104, 212).

The Committee's objections, however, turned out to be unnecessary. At the October 25 hearing, Arlington's counsel announced that LF had "breached the agreement we reached" by declaring "they're just not going fund anymore," and that "we have simply been double-crossed here." (Jt. Ex. 75 at 9). Under the circumstances, Arlington said, it was impossible to go forward. (Id. at 10). For its part, LF contended that it had fulfilled its obligations under the Interim Order (id. at 10, 17, 22) but agreed that no final order should be entered (id. at 10). With all parties concurring that no final order could or should be entered, Arlington withdrew its motion for entry of a final financing order. (Id. at 35; Stip. at ¶ 30).

---

[2]      The October 6 statement of account was a "revised" statement. (Jt. Ex. 12). On October 3, Shibe had mistakenly sent Dale a statement that neglected to reflect the LaSalle payoff and also showed that $320,000 in fees had been paid through a draw on the loan authorized in the Interim Order. (Jt. Ex. 9).

### g. Sale and Repayment

The same day that Arlington withdrew the motion, it filed an asset purchase agreement under which Sunburst Hospitality proposed to buy Arlington's assets. (Tr. at 2/163). On December 7, 2005, following an auction (Tr. at 3/113), the court entered an order approving the sale to Sunburst (Stip. at ¶ 31). The sale closed effective January 13, 2006. (*Id.* at 32). As a part of the sale, the Cendant agreements that had caused LF so much consternation were transferred to Sunburst. (Tr. at 2/252). (Apparently, they were transferable after all.) Cendant also paid Arlington $1,150,000. (*Id.* at 2/252, 2/257).

On January 25, 2006, following the closing, Arlington repaid LF the $3,514,861.11 principal balance borrowed under the Interim Order, as well as non-default interest calculated at the LIBOR rate plus 7.5%, for a total payment of $3,677,658.54. However, Arlington refused – and still refuses – to pay LF default interest or any of the fees associated with the loan it received. The Committee supports Arlington's refusal.

### 3. Analysis

LF's motion for payment of interest and fees as administrative expenses must be denied. The Interim Order, not the Term Sheet, contained the agreement governing the Revolver. LF's fees were therefore payable separately "upon invoice," as the Interim Order provided; they could not be paid through a draw on the Revolver, as Arlington believed. But before LF ever issued an invoice for the fees due when the Interim Order was entered, LF declared that it would lend no more money to Arlington. That declaration was an anticipatory repudiation of the agreement. At that point, Arlington was entitled to consider its relationship with LF over and its duties of performance discharged. Having refused to perform under the agreement, LF cannot insist that

-14-

Arlington continue to perform, paying interest and fees on a loan LF would not make.

### a. The Interim Order Contained the Parties' Agreement.

The question that has consumed the parties and the court (but in the end turns out not to matter) is what constituted the agreement for the Revolver. All other things being equal, the answer to that question would determine whether Arlington was entitled to pay the fees through a draw on the Revolver or had to pay them with funds of its own, and that in turn would settle whether Arlington was in default when it ignored LF's October 6 invoice. LF contends that the Term Sheet was not a binding contract, that the only contract was the Interim Order. Arlington disagrees, arguing that the Term Sheet and Interim Order together make up the contract because neither is integrated.

Both sides are wrong, although LF's position comes closer to the mark. LF and Arlington both ignore the fundamental nature of the process by which a debtor in bankruptcy is able to borrow money on a secured basis. Section 364 of the Code is, of course, the relevant provision. It allows the bankruptcy court, after notice and a hearing, to "*authorize* the obtaining of credit or the incurring of debt." 11 U.S.C. §§ 364(c), (d) (emphasis added). Bankruptcy Rule 4001 lays out the procedure for obtaining that authorization. It says that the party wanting authorization must file "[a] motion for authority to obtain credit." Fed. R. Bankr. P. 4001(c)(1). It then adds, critically: "The motion shall be accompanied by *a copy of the agreement*." *Id.* (emphasis added); *see also* 9 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 4001.06[2] at 4001-25 (15th ed. rev. 2006).

The process, in other words, entails two documents: (1) a motion, and (2) an agreement attached to the motion. 2 James F. Queenan, *et al., Chapter 11 Theory & Practice* §§ 13.01 at

13:5-6, 13.29 at 13:88 (1994); Bruce A. Henoch, *Postpetition Financing: Is There Life after Debt?*, 8 Bankr. Dev. J. 575, 590-91 (1991). The motion is the vehicle by which the agreement is presented to the court for approval. In granting the motion, the court approves the agreement presented, no more. *See In re Roxy Roller Rink Joint Venture*, 73 B.R. 521, 525 (Bankr. S.D.N.Y. 1987); *see also In re City Wide Press, Inc.*, 102 B.R. 431, 438 (Bankr. E.D. Pa. 1989). The agreement, not the order approving it, is the contract. *Roxy*, 73 B.R. at 525.

Because a debtor must have a loan agreement in hand before filing a motion under section 364, *see* Queenan, *et al.*, *supra*, § 13.01 at 13:7, LF is mistaken in asserting that the Term Sheet was not a binding contract but only a provisional "agreement to agree." Had the Term Sheet not been the proposed agreement between Arlington and LF, it would have meant that no agreement was submitted for the court's approval. Arlington's motion would then have violated Rule 4001(c)(1) and should have been denied out of hand. Instead, Arlington attached the Term Sheet to its motion and presented it to the court at the September 2 hearing as the parties' agreement, all with LF's acquiescence. LF is in no position now to call the Term Sheet something other than what it plainly was.[8]

Because an order granting a section 364 motion simply approves the parties' agreement,

---

[8]     Despite its Spartan qualities, the Term Sheet met all the requirements of a binding contract, at least for the Revolver. Illinois law supplies the relevant contract principles here. *See In re Harvey*, 213 F.3d 318, 320 (7th Cir. 2000). In Illinois, a contract requires an offer, an acceptance, and consideration. *In re Pre-Press Graphics Co.*, 310 B.R. 905, 913 (Bankr. N.D. Ill. 2004). There must also be competent parties, a valid subject matter, legal consideration, mutuality of obligation, mutuality of agreement, and terms definite enough to be enforced. *Id.* The only question here seems to concern the terms. The Term Sheet contained all the terms material to a loan agreement, *see McErlean v. Union Nat'l Bank of Chicago*, 90 Ill. App. 3d 1141, 1146, 414 N.E.2d 128, 132 (1st Dist. 1980) (describing essential terms of a loan agreement under Illinois law), and they were definite enough to be enforced, *see Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981, 984 (1991) (discussing definiteness).

LF is equally mistaken in asserting that the Interim Order was the agreement here – and

Arlington makes the same mistake when it argues that the Interim Order was not "integrated," an

argument that assumes the Interim Order was (or could be) the agreement. An order granting a

motion under section 364, it bears repeating, is *not* the contract. "The order merely authorizes a

debtor to enter into a transaction. It does not eliminate the need for appropriate agreements,

including security agreements, between the debtor and the lender." *Roxy,* 73 B.R. at 525.

Although the Interim Order was not itself the parties' agreement, however, it ultimately

reflected that agreement. Rather than simply stating that Arlington's motion was granted and

leaving it at that, the Interim Order went on to declare that Arlington was authorized to borrow

money and undertake financial obligations to LF "as described in the budget attached hereto as

Exhibit 1 . . . on the terms and conditions *contained in this Order.*" (Jt. Ex. 6 at 4) (emphasis

added). The Interim Order then laid out in detail the terms of the Revolver, including the loan

amount, the interest rates (regular and default), the many fees, the events of default, the cure

period, and everything else. The Term Sheet was not attached to the Interim Order or even

mentioned.[2]

Although the Term Sheet rather than the Interim Order was "the agreement" for purposes

of Rule 4001, the Interim Order nevertheless embodied the agreement approved under section

364 and so is what matters here. The Interim Order set out the terms of a complete loan

---

[2]        Still other provisions indicate that the Interim Order was a self-contained, stand-
alone document. The findings of fact supporting its entry noted that LF had "agreed to extend
DIP Financing *on the terms and conditions contained herein.*" (Jt. Ex. 6 at 3) (emphasis added).
The Interim Order declared that all post-petition advances to Arlington were to be "made in
accordance with the terms of *this Order.*" (*Id.* at 4) (emphasis added). The Interim Order not
only authorized but directed Arlington to perform its obligations "to give effect to the terms of
the financing *provided by this Order.*" (*Id.*) (emphasis added). The Interim Order neither
approved nor authorized financing under the Term Sheet.

agreement, just as the Term Sheet had done. *McErlean,* 90 Ill. App. 3d at 1146, 414 N.E.2d at

132. The Interim Order also expressly said that Arlington could borrow on the terms in the

Interim Order itself. In so doing, and in making no reference whatever to the Term Sheet, the

Interim Order superseded the Term Sheet. For all practical purposes, the parties' agreement

became what was described in the Interim Order. The Term Sheet became irrelevant.[10]

The substitution of the Interim Order for the Term Sheet would hold little more than

academic interest had the terms of the two documents been identical. But they were not. The

Term Sheet had a section entitled "Use of Proceeds" that allowed Arlington to use loan proceeds,

among other things, to "pay fees and expenses associated with this transaction." (Jt. Ex. 1 at 4).

The many fees to which LF was entitled could be paid through a draw on the Revolver. The

Interim Order, on the other hand, had no comparable "use of proceeds" provision. Except for a

specific paragraph authorizing repayment of the LaSalle loan, Arlington's use of loan proceeds

was restricted by the attached budget. The budget reflected Arlington's intent to draw on the

Revolver only to repay LaSalle; the fees owed to LF under the Interim Order were to be paid

separately. Arlington was accordingly obligated to pay those fees "upon invoice."[11]

---

[10]     The distinction between the parties' agreement and an order reflecting that
agreement is not hairsplitting. Neither party to the loan transaction signs the order; the only
signatory to an order under section 364 is the court. Yet the court obviously is not a party to the
transaction. The order memorializes the agreement, but it is not the agreement. *See Haverstick
v. Sources Fin. Holding Co., Ltd. (In re Haverstick),* 295 B.R. 101, 107 (Bankr. E.D. Mich.
2003) (noting that an order under section 364 containing loan terms "simply reflects the
agreement of the parties").

[11]     This was not the only difference. Arguably, the parties intended the various fees
payable to LF under the Term Sheet to serve as fees for the Revolver and also for the two term
loans – in other words, for the entire "DIP Facility." By placing all of those fees in the Interim
Order, however, the parties transformed them into fees for the Revolver alone. With no certainty
that a final order would ever be entered authorizing the term loans, the Interim Order effectively
approved an agreement for a loan on which the lender would reap a 41% return. (Tr. at 2/259).

-18-

Arlington challenges this conclusion, citing evidence at trial (including an e-mail exchange between counsel literally minutes before the Term Sheet's execution) showing that both parties always understood the fees would be paid through a draw on the Revolver. Orders of this kind, though, are governed by rules of contract interpretation. *See Haverstick*, 295 B.R. at 107; *cf. Siemens Energy & Automation, Inc. v. Good (In re Heartland Steel, Inc.)*, 389 F.3d 741, 744-45 (7th Cir. 2004) (stating that when private parties produce "a document that looks like a contract," it is interpreted according to "ordinary rules of contract construction"). Illinois employs the "four corners" rule of contract interpretation. *See Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999) (internal quotation omitted). Under that rule, an agreement reduced to writing is "presumed to speak the intention of the parties who signed it." *Id.* If the contract's language "is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Id.*

The provisions of the Interim Order governing how much Arlington could borrow and why were not ambiguous. The Order authorized Arlington "to borrow money and undertake financial obligations . . . as described in the budget." The budget permitted Arlington to draw $3,530,000 during the week of September 2, 2005, to pay off the "LaSalle WC Revolver," and that was all. "DIP Fees" of $340,000 were listed for that week but were to be paid with separate funds from Arlington: the budget lines for "DIP Funding," "Total DIP Amount Used," and "Ending DIP Balance" all have the same figure, $3,530,000, the balance of the LaSalle loan. The balance does not include fees associated with the Revolver. With the Interim Order clear on its face, and with no room available for a contrary interpretation, parol evidence of the parties'

-19-

allegedly contrary intent is out of bounds.[12]

Because the Interim Order, not the Term Sheet, was the operative document here, LF's

fees were payable, not from a draw on the Revolver, but with separate funds "upon invoice."

Arlington would therefore have been obligated to pay LF its fees on receipt of the October 6

invoice, and would have been in default for failing to pay them, had events not intervened.[13]

### b. LF Anticipatorily Repudiated the Agreement.

But events did intervene.  Before Arlington could breach the agreement by failing to pay

the October 6 invoice – in fact, before the invoice was even issued – LF refused to lend Arlington

any more money.  In so doing, LF anticipatorily repudiated the agreement.

Under Illinois law, an anticipatory repudiation takes place when a party to a contract

_____

[12]     Arlington argues that LF has waived any parol evidence argument because
evidence of the parties' pre-contractual conversations was admitted without objection.  Despite
its name, however, the parol evidence rule is a rule of substantive contract law, not a rule of
evidence.  *Bank of Naperville v. Holz*, 86 Ill. App. 3d 533, 537, 407 N.E.2d 1102, 1106 (2nd
Dist. 1980).  Failure to object to the admission of parol evidence at trial therefore does not waive
the rule's applicability.  *See In re Penn-Dixie Indus., Inc.*, 22 B.R. 794, 797 (Bankr. S.D.N.Y.
1982) ("Even if there is no objection to parol evidence by the litigants, the court should
nevertheless exclude parol evidence from its consideration since this rule is not a rule of
evidence, but rather a rule of substantive law.").

[13]     A financing order like the Interim Order here – one that specifies the terms of the
financing – is unnecessary, inconsistent with Rule 4001(c)(1), and, as this case illustrates, bad
practice.  An order like this is unnecessary because the terms are already in the agreement itself;
they do not need to be repeated in the order.  An order like this is inconsistent with Rule
4001(c)(1) because, as discussed earlier, the rule contemplates a procedure under which the
debtor simply submits an agreement to the court for approval; if the motion is successful, the
court does no more than approve the agreement.  An order like this is bad practice because it
risks implementing terms inconsistent with the parties' agreement, as the Interim Order here did.
Instead of approving the agreement, the order substitutes a new one, with unpleasant surprises
and hefty litigation costs to follow.  The Interim Order in this case should simply have granted
Arlington's motion, approved the Term Sheet, specified the inducements under sections 364(c)
and (d) to which LF was entitled – and then stopped.

manifests an intent not to perform its contractual duty when the time for performance arrives. *In re Marriage of Olsen,* 124 Ill. 2d 19, 24, 528 N.E.2d 684, 686 (1988); *Busse v. Paul Revere Life Ins. Co.,* 341 Ill. App. 3d 589, 594, 793 N.E.2d 779, 783 (1st Dist. 2003); *Pope ex rel. Pope v. Economy Fire & Cas. Co.,* 335 Ill. App. 3d 41, 46, 779 N.E.2d 461, 465 (1st Dist. 2002). The manifestation must be clear and unequivocal, *Pope,* 335 Ill. App. 3d at 46, 779 N.E.2d at 465, not "doubtful or indefinite," *Busse,* 341 Ill. App. 3d at 594-95, 793 N.E.2d at 784. Whether an anticipatory repudiation has occurred is a factual question to be determined on a case-by-case basis. *Truman L. Flatt & Sons Co. v. Schupf,* 271 Ill. App. 3d 983, 987, 649 N.E.2d 990, 994 (4th Dist. 1995).

Here, LF manifested its intent not to perform under the Interim Order more than a week before it sent the October 6 invoice to Arlington. On September 29, Marks told Morgner that LF was unwilling to "fund any more money under the DIP." Morgner passed this message on to Miller, Arlington's president. On October 4, having apparently gotten wind of LF's position, counsel for the Committee asked LF's outside counsel to verify it. And he did, replying: "We are not willing to proceed further with the DIP loan; in other words, we will make no further loans to the Debtors." These are clear and unequivocal statements that LF would not comply with the Interim Order and would not lend any additional funds to Arlington should it attempt further draws. The statements are neither doubtful nor indefinite. To the contrary, they are emphatic.

Viewing LF's statements in the context of all the evidence reinforces the conclusion that LF was pulling out. LF had never been happy in its role as post-petition lender. Its creator, Diamond, had no experience as a lender to debtors in bankruptcy and no real understanding of the bankruptcy process. With PMC holding a "legal gun" to Arlington's head (Tr. at 1/42), LF

-21-

felt rushed into the Term Sheet, negotiating the document in a matter of days based on what it considered insufficient due diligence. LF nevertheless supported entry of the Interim Order as a "leap of faith" to preserve its option to be the stalking horse bidder for Arlington. Once the Interim Order was entered, however, LF's jitters only increased. LF continued to find it difficult to learn as much about Arlington as it wanted, and what it did learn simply raised additional doubts about the value of the company and the wisdom of any bid. By mid-September, Diamond concluded it would not be a bidder. And when Marks told Morgner just two weeks later that LF would not "fund any more money under the DIP," the meaning was clear: LF would not be a lender, either. LF had had enough of Arlington. It wanted out.

LF, though, contends that it wanted nothing of the sort, that the Revolver continued to be available to Arlington. In making these statements, LF says, it meant only that it would not proceed with an agreement or a final order on Term Loans A and B. At trial, Marks repeatedly testified as much. (*See, e.g.,* Tr. at 2/94-96, 2/134, 2/140, 2/145-46).

But Marks's protestations of LF's continued willingness to fund the Revolver were not credible. Not only were they inconsistent with the evidence as a whole, which plainly showed LF's desire to exit the Arlington scene entirely, but they contradicted his statements to Morgner and counsel's statements to the Committee. According to Morgner (and his account was not disputed), Marks said LF would not lend any more money under "the DIP." The e-mail from LF's outside counsel similarly refused to proceed further with "the DIP loan." LF's people typically used "the DIP," "the DIP loan," and "the DIP financing" as shorthand for the post-petition financing as a whole, not just elements of it.[14] (*See, e.g.,* Tr. at 1/32-33, 1/37, 1/40-43,

---

[14]    Counsel's e-mail not only said that LF would not "proceed further with the DIP loan" but also advised Arlington to "find a new DIP lender to pay out our loan." As Arlington

1/47-48, 2/16, 2/34, 2/42-44; Rubin dep. at 11, 81; Marks dep. at 59; McDaniel dep. at 110, 124;

*see also* Tr. at 2/249 (Morgner testimony that in conversation Marks would refer to the Revolver

as "the DIP")). There was no evidence LF ever told Arlington that it was no longer interested in

finalizing the term loans but that the Revolver, of course, was still in place. LF's unmistakable

message was that no more money was available, *period*.[15]

 LF next suggests there was no repudiation because it never actually rejected any draw

request from Arlington on the Revolver, let alone a draw request after the so-called repudiation.

It rejected no draw requests because Arlington made none after the first one on September 2.

 LF is right that Arlington made no further draw requests, but the point is irrelevant. An

anticipatory repudiation "continues in effect until affirmatively retracted by the repudiator."

*Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 260, 594 N.E.2d 1177, 1187 (1st Dist. 1992);

*see also Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 58 Ill. App. 3d 100, 105,

373 N.E.2d 863, 868 (3rd Dist. 1978). Once LF declared unequivocally that it would not lend

---

rightly argues, the only loan a new lender could "pay out" would have been the Revolver; the
term loans had not yet been made. Had LF been willing to continue funding the Revolver, as it
now insists it was, no "pay out" from a new lender would have been necessary.

 [15] The message was admittedly delivered to Chanin and to the Committee, not to
Arlington directly. Some authorities say that to serve as an anticipatory repudiation, the
repudiating statement must be made "to an obligee under the contract," *see, e.g.*, Restatement
(Second) of Contracts § 250, cmt. b (1981); 9 Arthur L Corbin, *Corbin on Contracts* § 973 at 808
(Interim ed. 1979) ("Corbin"), not to a "mere stranger," 2 E. Allan Farnsworth, *Farnsworth on
Contracts* § 8.21 at 561 (3rd ed. 2004) ("Farnsworth"). In this case, however, Chanin was
Arlington's investment banker and agent in the bankruptcy. Statements to an agent on matters
within the scope of the agent's authority are statements to the principal. *City of Aurora v.
Classic Syndicate, Inc.*, 946 F. Supp. 601, 604 (N.D. Ill. 1996); *Mitchell Buick & Oldsmobile
Sales, Inc. v. National Dealer Servs., Inc.*, 138 Ill. App. 3d 574, 582, 485 N.E.2d 1281, 1286-87
(2nd Dist. 1985). And although the Committee was not Arlington's agent, LF had to know, in
the small, tightly knit community of a chapter 11 bankruptcy, that its comments to the Committee
would make their way back to Arlington. The Committee was no "mere stranger" to Arlington's
dealings with LF.

another nickel, Arlington did not have to try to cajole LF into performing. *In re C & S Grain
Co.,* 47 F.3d 233, 237 (7th Cir. 1995) (stating that "the non-repudiating party need not make
efforts to keep the contract in force"). Nor did it have to test LF's sincerity by submitting draw
requests to see if they would be turned down. Arlington was entitled to take LF at its word.
*Builder's Concrete,* 58 Ill. App. 3d at 105, 373 N.E.2d at 868; *see also Wilmette Partners,* 230
Ill. App. 3d at 260, 594 N.E.2d at 187 (observing that "the law never requires a useless act").

Somewhat along the same lines, LF argues that Arlington waived any breach because it
never disputed LF's repudiation: in the days following it wrote no letters, sent no faxes, made no
telephone calls. "In response to what [Arlington has] since decided was a catastrophic event,"
LF observes, Arlington "did exactly nothing."

LF is right that as far as the record shows, Arlington did not mention the repudiation for
almost a month. But this point, too, is irrelevant. A party faced with an anticipatory repudiation
of an agreement has no obligation to notify his opposite number that he is deeming the
repudiation to be a breach. John Edward Murray, Jr., *Murray on Contracts* § 109 at 703 n.478,
704 (4th ed. 2001) ("Murray") (stating that "[t]he obligee need not 'accept' the repudiation by
notification to the repudiator"); 9 Corbin, *supra,* § 981 at 829-30. True, the breaching party can
retract its repudiation until it receives such a notice, effectively undoing the breach, *see Schupf,*
271 Ill. App. 3d at 990, 649 N.E.2d at 996; Murray, *supra,* § 109 at 704, but LF never issued a
retraction. When Arlington declared on the record in open court on October 25 that it had been
"double-crossed" because LF had announced "they're just not going to fund any more" and so
had "breach[ed] the agreement," that was as clear a notice of an intent to treat LF's actions as a
breach as can be imagined. There was no waiver.

In short, Arlington was indeed obligated to pay LF's fees upon invoice. But before LF

-24-

could issue an invoice, and so before Arlington could breach the parties' agreement by failing to

pay it, LF repudiated the agreement by declaring that it would no longer lend to Arlington.

### c. LF's Breach Ended Arlington's Obligation to Perform.

Once LF repudiated the agreement, Arlington could consider the agreement over and

done. At that point, Arlington no longer had any responsibility for the fees in the Interim Order.

When one party anticipatorily repudiates an agreement, the repudiation discharges any

remaining duties of performance the other party to the agreement might have. *C & S Grain*, 47

F.3d at 237 (stating that "in the face of clear evidence of an intent to repudiate, the

nonrepudiating party is no longer under an obligation to perform"); Restatement (Second) of

Contracts § 253, cmt. b (1981); 2 Farnsworth, *supra*, § 8.20 at 550; Murray, *supra*, § 109 at 701.

That party can "treat the repudiation as a breach putting an end to the contract for all purposes of

performance," *Bituminous Cas. Corp. v. Commercial Union Ins. Co.*, 273 Ill. App. 3d 923, 930,

652 N.E.2d 1192, 1197 (1st Dist. 1995); *Wilmette Partners*, 230 Ill. App. 3d at 260, 594 N.E.2d

at 1187, and can "walk away from the contract without liability," *First Nat'l Bank of Louisville v.*

*Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 933 F.2d 466, 469 (7th Cir. 1991).[16]

When LF refused to "fund any more money under the DIP," Arlington was relieved of its

obligation to keep its end of the bargain. The fees and charges laid out in the Interim Order were

---

[16]    This is simply an application of the familiar "doctrine of conditions," *Stanley
Gudyka Sales Co. v. Lacy Forest Prods. Co.*, 915 F.2d 273, 277 (7th Cir. 1990), or "material
breach doctrine," *Dragon Constr., Inc. v. Parkway Bank & Trust*, 287 Ill. App. 3d 29, 33, 678
N.E.2d 55, 58 (1st Dist. 1997), under which one party's material breach discharges the other
party's duties of performance, *Eager v. Berke*, 11 Ill. 2d 50, 54, 142 N.E.2d 36, 38 (1957);
*United States Fid. & Guar. Co. v. Old Orchard Plaza Ltd. P'ship*, 284 Ill. App. 3d 765, 776, 672
N.E.2d 876, 884 (1st Dist. 1996). When the breach takes the form of an anticipatory repudiation,
"the repudiation has the same effect as the nonoccurrence of a condition of those remaining
duties." *See* 2 Farnsworth, *supra*, § 8.20 at 550.

conditioned on the availability of the Revolver. Once LF made clear that the Revolver was no longer available under any circumstances, the contractual relationship was over, and nothing more was required of Arlington (except perhaps to repay the amounts borrowed, *see* Murray, *supra*, § 126 at 828-29). Certainly, Arlington had no duty to pay fees and charges for a loan it did not receive. In paying back the $3.5 million it did borrow with interest at the non-default rate, Arlington did rather more for LF than it had to. LF has no right to receive the rest of the fees and charges as administrative expenses in the bankruptcy.

Because LF relies so heavily on *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990), it is worth noting in closing that the decision is no help to LF's claim. In *Kham & Nate's Shoes*, a post-petition lender extended a line of credit to a chapter 11 debtor under a financing order, but after making several advances the lender declined to make any more. *Id.* at 1353-54. Believing the lender had "behaved inequitably" in shutting off the flow of funds given the debtor's "plight," the bankruptcy court not only vacated the financing order but subordinated the lender's debt under section 510(c). *Id.* at 1354, 1356. On appeal, however (the district court having affirmed), the court of appeals disagreed and reversed. A lender extending post-petition credit to a debtor under a bankruptcy court's order, the court said, "is entitled to the benefit of that order, even if it turns out to be legally or factually erroneous." *Id.* at 1355. A bankruptcy court therefore lacks the power to undo a financing order except when the lender has "acted in bad faith" – "a very narrow exception." *Id.* at 1355.

At first blush, *Kham & Nate Shoes* appears to bolster LF's position here.[17] The pivotal

---

[17]    It certainly punches a large hole in the Committee's argument that this court should reconsider and vacate the Interim Order either because of the Interim Order's terms or because of LF's subsequent conduct. The argument had thin support in the case law in any event. Of the many decisions the Committee cites, only one, *In re FCX, Inc.,* 54 B.R. 833 (Bankr.

difference is that unlike LF, the lender in *Kham & Nate's Shoes* was invoking its rights under the loan agreement in refusing to advance further funds to the debtor. The agreement provided "for cancellation on five days' notice" and added that "'nothing provided herein shall constitute a waiver of the right of the Bank to terminate financing at any time.'" *Id.* at 1353. The court of appeals noted that the parties had "signed a contract expressly allowing the Bank to cease making further advances." *Id.* at 1357. In terminating the financing, the lender had simply "exercised its contractual privilege," a privilege it could exercise "for any reason satisfactory to itself." *Id.* To the court of appeals, this was the critical fact: the lender was "entitled to advance its own interests" consistent with the agreement, and the equities of its decision were "legally irrelevant so long as [the] Bank kept its promises." *Id.* at 1358.

LF is correct, then, that *Kham & Nate's Shoes* insulates financing orders from the wisdom of hindsight. But the decision does not bind debtors to financing orders on the one hand and leave lenders free to ignore them on the other. Financing orders under section 364 approve financing *agreements, see* Fed. R. Bankr. P. 4001(c)(1), and, as *Kham & Nate's Shoes* demonstrates, when it comes to enforcing those orders contractual principles apply. The animating principle of *Kham & Nate's Shoes* is not so much that financing orders are sacred but that "a deal is a deal." LF failed to heed that principle here.

### 4. Conclusion

The motion of Arlington LF, LLC for allowance and payment of post-petition

---

E.D.N.C. 1985), appears to endorse a bankruptcy court's authority to revisit financing orders. *Vafer Inv. Group, L.L.C. v. Case (In re Visionaire Corp.),* 299 B.R. 530 (B.A.P. 8th Cir. 2003), another of the Committee's decisions, actually reaches the opposite conclusion, finding that the bankruptcy court abused its discretion in altering an interim financing order. *Id.* at 535.

administrative expense and secured claims is denied.  This opinion constitutes the court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  A separate order will

be entered.

Dated:  May 10, 2007

_____
A. Benjamin Goldgar
United States Bankruptcy Judge